# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

———————

.

COMMONWEALTH *vs.* BENJAMIN SERRANO.

No. 08-P-912.

Essex. January 15, 2009. - March 27, 2009.

Present: GREEN, BROWN, & VUONO, JJ.

*Homicide. Joint Enterprise. Practice, Criminal,* Instructions to jury. *Evidence,* Joint enterprise, Prior misconduct, Argument by prosecutor.

There was insufficient evidence at a murder trial to warrant a jury instruction on withdrawal from a joint venture. [3-4]

At a murder trial, the judge's instructions to the jury, given in an attempt to clarify the "presence" element of joint venture in response to a jury question, did not create a substantial risk of a miscarriage of justice, where the judge correctly stated the law; where the instructions neither changed the elements of joint venture from those that the Commonwealth proved at trial nor deprived the defendant of the notice required for him to defend against the charges; and where, given the facts of the case, the defendant's presence at the time of the fatal gunshot was of no consequence in the determination whether he was a joint venturer. [4-6]

At a criminal trial, the judge did not abuse his discretion in admitting in evidence (under a limiting instruction) references to the defendant's prior incarceration, where the evidence provided context for the crime charged,

and where, in any event, there was ample other evidence of the defendant's motive. [6-7]

At a murder trial, the prosecutor's statements in closing argument did not exceed the bounds of fair inference from the evidence, and the jury did not have to engage in impermissible conjecture in order reasonably to draw the commonsense inference suggested by the prosecutor. [7]

INDICTMENT found and returned in the Superior Court Department on May 5, 2004.

The case was tried before *Richard E. Welch, III*, J.

*Leslie W. O'Brien* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant appeals from his conviction of murder in the second degree. He seeks a new trial on the grounds that (1) the judge improperly refused to give instructions on withdrawal from a joint venture, (2) the judge improperly instructed the jury on an aspect of joint venture not pursued by the Commonwealth at trial, (3) the judge erred in allowing the prosecution to present evidence that the defendant was incarcerated prior to the murder, and (4) the prosecutor wrongfully argued facts not in evidence.

*Facts.* The jury could have found the following facts. In October of 2003, while the defendant was in jail, his girlfriend at the time broke up with him. In January of 2004, she began dating the victim. During the remainder of the defendant's incarceration, the now ex-girlfriend received many letters from the defendant, pleading with her to resume the relationship. After he got out of prison in February of 2004, the defendant began to harass the ex-girlfriend and her new boyfriend, the victim, on the telephone and by confronting them in person, on multiple occasions. At these encounters, he threatened to kill her, members of her family, and the victim.

At around 9 P.M., April 1, 2004, the fatal confrontation between the victim and defendant occurred. The defendant went to the ex-girlfriend's apartment with a companion, Luis Penn, the codefendant.[1] When the defendant knocked at the door, he was

---

[1]Penn was found guilty after a separate jury trial of murder in the first degree.

told that the ex-girlfriend was not there. The defendant then went outside, where he saw the victim's car. The two occupants of the car, neither of whom was the victim, got out and questioned the defendant as to why he was following them. The defendant took out a gun and told the two men to leave, and that "it's not with you." One of the men told him to put down the gun and use his hands, pulling up his shirt to show the defendant that he was unarmed. Shortly thereafter the victim emerged from the ex-girlfriend's home.

The victim stepped between the defendant and the two men; an argument ensued about the ex-girlfriend. One of the men continued to yell at the defendant to "fight like a man." The defendant summoned the codefendant over and gave him the gun. After the defendant punched the victim, a fight erupted between the two; all the while the codefendant pointed the gun at the other two men, one of whom left the scene to call the police. The fight moved up the street. The victim broke away from the defendant. A man who was pumping gasoline about a block away saw the codefendant and the victim engage in a face-to-face argument for about thirty seconds, and then he saw the codefendant shoot the victim in the head. He did not see the defendant. The man called 911 on his cellular telephone; he then followed the codefendant to see if he recognized him.

*Withdrawal instruction.* The defendant argues that there was insufficient evidence of a joint venture, and that the codefendant was solely responsible for the victim's death. He requested an instruction on withdrawal from a joint venture. In light of the lack of evidence demonstrating that the defendant communicated to the codefendant his intention to withdraw from the enterprise, the judge, apparently concluding that there was an insufficient basis to support the withdrawal theory, declined to give the instruction at the close of the case.

Assuming that the defendant properly preserved all issues relating to the withdrawal instruction,[2] we think there was insufficient evidence at trial to warrant a withdrawal instruction. We

[2]The Commonwealth contends otherwise and argues that our review of some aspects of the defendant's argument is limited to a "substantial risk of a miscarriage of justice." See *Commonwealth* v. *Carlson*, 448 Mass. 501, 506 (2007).

conclude, as did the trial judge, that the events immediately leading to the victim's death happened very quickly, and no "appreciable interval between the alleged termination and the fatal shooting, a detachment from the enterprise before the shooting has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that [the] other principal[] in the attempted crime [had] opportunity also to abandon it" occurred here. *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 (1988), quoting from *Commonwealth* v. *Green*, 302 Mass. 547, 555 (1939).

*Joint venture instructions.* During deliberations, the jury sent the judge a note asking: "Does [the defendant] have to be [] present at the time of actual 'murder'?" In response, the judge instructed that

> "a joint venturer . . . has to be present at or near the scene. But . . . you don't have to be right at the location.
>
> ". . .
>
> "[T]he Commonwealth does not have to prove that the defendant was actually present at the scene at the time that the gun was shot, as long as the Commonwealth shows that the defendant was present; that is, was at or near the general vicinity of the crime, at — at some point during the joint venture. The joint venturer does not have to be there at the culmination of the crime."

The defendant contends that in attempting to clarify the "presence" element of joint venture, the judge inadvertently instructed the jury on a separate theory of the crime, thus depriving the defendant of notice and a chance to defend against it. See, e.g., *Commonwealth* v. *Tavares*, 61 Mass. App. Ct. 385, 388-389 (2004), discussing the two types of joint venturer liability. We noted in *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 380 (2000), that there is some confusion associated with the need for "presence" in joint venture cases. While "presence is *not* required where a defendant actually 'aids or abets' in the commission of a crime[,] presence generally *is* required where a conviction is sought on the basis that a defendant 'shared' the principal's criminal intent (i.e., 'mental state'), and may have

merely stood by, but by agreement was ready to assist if neces-
sary" (emphasis in original). *Id.* at 381. The parties agree that
the Commonwealth submitted evidence only of the latter type
of joint venture.

The trial judge has "discretion . . . to choose the form of
expression best adapted to make the law intelligible to the
jurors." *Commonwealth* v. *Silva*, 388 Mass. 495, 507 (1983).
When the jurors asked for clarification on the element of pres-
ence, the judge first consulted with the attorneys, and the defense
counsel raised no objection. Therefore, to reverse we must find
that there was a flaw in the instructions and that the flaw caused
a substantial risk of miscarriage of justice. See *Commonwealth*
v. *Whitman*, 430 Mass. 746, 750 (2000), and cases cited.

There was no substantial risk of a miscarriage of justice. By
describing "presence" to mean "at or near the general vicinity
of the crime . . . at some point during the joint venture," the
judge correctly stated the law. See *Commonwealth* v. *Kilburn*,
426 Mass. 31, 34 n.5 (1997), quoting from *Commonwealth* v.
*Mahoney*, 405 Mass. 326, 329 (1989) ("It is well settled . . .
that individuals may be considered present for joint venture pur-
poses even where they are only 'in the vicinity of the crime' ");
*Commonwealth* v. *Tavares*, 61 Mass. App. Ct. at 388 ("A defend-
ant need not be at the scene of a crime throughout its occurrence
in order to be found a joint venturer"). The judge's instructions
did not change the elements of joint venture from those that the
Commonwealth proved at trial, and did not deprive the defendant
of the notice required for him to defend against the charges.

Following the reasoning of *Commonwealth* v. *Lafayette*, 40
Mass. App. Ct. 534, 537 (1996), since the defendant here
(1) initiated the animosity between himself and the victim;
(2) brought the gun to the altercation; (3) threatened on multiple
occasions to kill the victim, even stating, "This is how I want to
catch you," as he pointed the gun at the victim's head; (4) pro-
ceeded to beat up the victim after handing the gun to his com-
panion; and (5) did not engage in any other "withdrawal" behavior,
his presence at the time of the fatal shot is of no consequence in
a determination whether he was a joint venturer. Furthermore, the
defendant "acted with knowledge of the [crime] and with the
intent to assist in the commission of that crime so as to accomplish

its objective," which was to harm the victim. *Commonwealth* v. *Batista*, 53 Mass. App. Ct. 642, 646 (2002). Moreover, as already mentioned, the jury were warranted in finding that the defendant made no communication to the codefendant of his lack of intent to kill or cause grievous bodily harm to the victim. In short, his willingness and availability to help his companion (or in this case, his acquiescing to his companion's shooting of the victim) have been established on the record.

*Reference to prior incarceration.* The prosecution may not introduce evidence of the defendant's prior bad acts, including past incarcerations, "for the purposes of showing his bad character or propensity to commit the crime charged . . . . [It] must be excluded unless it comes within one of the permitted uses, such as to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), and cases cited. See Mass. G. Evid. § 404(b) (2008-2009). As the judge observed in his limiting instructions, the evidence was relevant to the location and *unavailability* of the defendant when the breakup with his girlfriend occurred, and the involuntariness of his absence from the area. The evidence provided context rather than motive, particularly because the ex-girlfriend testified that the defendant did not threaten her or the victim until after he got out of jail.[3] We are not persuaded that the judge abused his discretion in concluding that this evidence could be admitted under a limiting instruction.[4] The judge cautioned the jury strongly against making any connection between the evidence of the defendant's incarceration and the charge on which he was being tried.

Moreover, there was ample evidence of the contentious relations of the defendant, his ex-girlfriend, and the victim in the two months between the defendant's release from prison and the murder, from which the jury could have reasonably inferred that the defendant's motive for the murder arose from his extreme

---

[3]As the defendant properly preserved the error, we review "according to a nonprejudicial error standard." *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

[4]Though it is conceivable that the evidence could have been sanitized in some manner to describe the defendant's unavailability without reference to his incarceration, it is likely that any attempt to do so would have created more confusion than illumination.

reluctance to end his relationship with the ex-girlfriend. Thus, we may fairly conclude that, if the admission of evidence of incarceration was error, "the error did not influence the jury, or had but very slight effect," and that "the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

*Closing argument.* In light of the previous discussions regarding the definition of the "presence" element of joint venture, and the use of the defendant's prior incarceration, we believe that "[t]he prosecutor's statements here did not exceed the bounds of fair inference from the evidence, and the jury — admonished by both the judge and counsel to apply their common sense and experience in their deliberations — did not have to engage in impermissible conjecture in order reasonably to draw the common-sense inference suggested by the prosecutor." *Commonwealth* v. *Correia*, 65 Mass. App. Ct. 27, 31-32 (2005), and cases cited.

*Judgment affirmed.*